MARGARET MCFARLAND *vs.* WILLIAM J. LYNCH.

FEBRUARY 19, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. This action in assumpsit was tried before a justice of the superior court sitting with a jury. At the conclusion of the plaintiff's testimony, the trial justice granted the defendant's motion for a nonsuit. The case is before us solely on the plaintiff's exception to this ruling.

The declaration is in five counts. The first count is in *indebitatus* assumpsit; the second, third and fourth counts charge the defendant as indorser on three promissory notes; and the fifth count contains the common counts. The defendant filed a plea of the general issue to all counts, and also

filed a special plea to the second, third and fourth counts denying consideration and that the plaintiff was a holder in due course.

Omitting all reference to matters of accounting, the pertinent evidence on the various issues is as follows. The defendant was engaged in the real estate and mortgage business in the city of Pawtucket, and one Mary Kelly was connected with him in some way in that business. Mary Kelly was a first cousin of the plaintiff, a woman seventy-two years old, and had the confidence of the plaintiff and her family, consisting of her husband and adult son. The plaintiff lived on a farm on the post road in North Kingstown, where she conducted a small business in homemade pies. Mary Kelly and the defendant had adjoining summer places at Quonset Point, the road to which led by the plaintiff's home. The plaintiff became acquainted with the defendant and his business through Mary Kelly and by his stopping at her home for pies. During this period Mary Kelly kept advising the plaintiff to invest her savings and, acting upon such advice, the plaintiff turned over to her various sums of money at different times, amounting in all to $1800, which money was to be invested with the defendant in second mortgages. This sum and the $5000 to which we are about to refer make up the $6800 in dispute in this case.

It appears in evidence that on Saturday, May 9, 1931, the plaintiff sold her farm and pie business for $5000, and that on that same day she deposited this entire sum in her name in the Union Trust Company of Providence. According to the plaintiff's testimony, which is substantially corroborated by her husband and son, Mary Kelly came to her house the next day and stayed over night. While there, Mary Kelly urged and finally persuaded the plaintiff to let her have the money that the plaintiff had received from the sale of the farm so that she, Mary Kelly, could give it to the defendant for *second* mortgages. The

plaintiff's testimony on this point is as follows: "Well, she was to get me second mortgages from Mr. Lynch. . . . Yes, as I understood it, they were both equally liable to me for that money that I turned over . . . ."

The following morning, Monday, May 11, Mary Kelly took the plaintiff in her automobile to the Union Trust Company in Providence, and the plaintiff then withdrew the $5000 that she had deposited in that bank the preceding Saturday, such withdrawal being in the form of a treasurer's check for that amount payable to the plaintiff. This bank check, to which we will again refer, was indorsed by the plaintiff and given by her to Mary Kelly, who then left the plaintiff in somewhat of a hurry, saying that she was going directly to the defendant's office in Pawtucket.

An official of the Industrial Trust Company, Pawtucket Branch, testified that on May 12, the defendant deposited $5015.13 to his account in that bank, and that the treasurer's check of the Union Trust Company for $5000, dated May 11 and payable to the plaintiff, was one of the items in that deposit. This check, when paid through clearing on May 13, bore the following indorsements: "Margaret A. McFarland, William J. Lynch, Industrial Trust Company May 12, 1931—Pawtucket Branch" and Industrial Trust Company, Providence."

Later in the month of May the plaintiff received, in a manner not disclosed in evidence, three mortgage notes and their respective mortgages in the aggregate sum of $6800, the same total amount that the plaintiff testified she gave to Mary Kelly to invest with the defendant in second mortgages. These three notes and mortgages, all drawn to the defendant as mortgagee and transferred by him to the plaintiff, are identified in the evidence as the Blais mortgage, for $2000, payable eight years from its date, January 20, 1930; the Crowe mortgage, for $2100, dated April 16, 1931, and payable in monthly instalments

of $15 a month; and the Menatian mortgage, for $2700, dated December 26, 1930, and payable in monthly instalments of $20 a month. The plaintiff, her husband and her son all testified that they examined the notes of these mortgages when they were first received by the plaintiff and that at that time there was no writing of any kind after the defendant's name as indorser on any one of the three notes. It was not long after the plaintiff received these mortgages that Mary Kelly advised and induced the plaintiff to turn over to her the three notes and mortgages, promising the plaintiff that "she (Mary Kelly) would take and put them in the safe for safe deposit because I was moving . . . ."

The plaintiff further testified that in the fall of 1931, and at other times thereafter, she asked Mary Kelly to return these documents to her, but that Mary Kelly always had some excuse for delay; that she, the plaintiff, finally received the Blais and Menatian mortgages, but not the Crowe mortgage, by registered mail in an envelope bearing the defendant's return address and postmarked "Pawtucket. October 15, 1932"; and that when she examined the notes of these two mortgages she noticed that the words "without recourse to me" had been added after the defendant's name on each note. The testimony of her husband and her son is to the same effect.

Within a day or so of this discovery, the plaintiff and her son went to Mary Kelly's home in Pawtucket and, being unable to see her because of her illness, they then went to the defendant's office in that city and found him there. The conversation that followed at this meeting, as related by the plaintiff and substantially supported by the son in his testimony, in so far as material to the issues now before us, is as follows: "I took out my mortgages, the two, and I said: 'I see that without recourse to me has been added since I had them,' and he said: 'Yes, it should have been there before.' I said: 'It wasn't there

when I took them' and he said: 'It should be on every mortgage.' " The plaintiff also testified that when she asked him "Where is the Crowe mortgage?" his answer was: "There is some figuring to do on that and you will get it later."

Mary Kelly died on October 23, 1932, and as the Crowe mortgage had not been returned to the plaintiff by that time, the plaintiff's son testified that he went to the defendant's office and asked him why he hadn't sent the Crowe mortgage; that the defendant's reply was: "I have it here but I have a little more figuring to do"; that he, the witness, then demanded the return of the mortgage, and that the defendant finally gave it to him but not before the defendant had gone into another room and added "a string of payments to it that was not on it before." The words "without recourse to me" also appear after the defendant's name on this note.

This witness further testified that at his previous visit to the defendant's office shortly before Mary Kelly's death, when he went there with his mother, the defendant said at that time that "he wished Mary Kelly would get well soon, that she was a great loss to him on account of not being on the job, that she was worth $2500 to him just to sit at the desk in his office." He also testified that on one occasion when the defendant stopped at the farm before it was sold by his mother, the defendant, in a conversation with him, praised Mary Kelly as a great worker and added: "She can get the money for me better than anyone I ever had working for me."

The uncontradicted testimony of an attorney who examined the land records is that the Crowe, Blais and Menatian mortgages, in the order named, were third, fourth and sixth mortgages and that in each instance all mortgages subsequent to the first mortgages were mortgages to the defendant. The premises covered by the Blais and Crowe mortgages were sold at foreclosure sales by the first

mortgagees, the plaintiff receiving no part of the proceeds from such sales. There is also testimony, fairly open to diverse inferences, that in the Crowe mortgage the letter "s", italicized by us in the sentence "This mortgage is subject to mortgages of record," was not there when that mortgage was recorded on January 20, 1930. A further detailing of the evidence is not necessary for the purposes of the instant case.

The trial justice in this state of the evidence granted the defendant's motion for a nonsuit. The transcript indicates but does not report a discussion that apparently took place between the trial justice and counsel for the defendant before granting the nonsuit, in the course of which the trial justice probably indicated the ground for his ruling. When he actually nonsuited the plaintiff, however, all that he said, according to the record before us, was: "Well, all right. I am going to grant Mr. Risk's motion to nonsuit the plaintiff on the ground of this consideration and other grounds." What "this consideration" and the "other grounds" were upon which he rested his decision we are unable to determine. It is far better practice, if not the duty of a trial justice, to state the grounds for his decision in the record and not to leave them to surmise and speculation.

In the circumstances of this case, we are of the opinion that the trial justice clearly erred in nonsuiting the plaintiff. We have repeatedly said that on a motion for nonsuit or direction of verdict for the defendant, the case must be submitted to the jury if there is any evidence to support the plaintiff's right of action. In ruling on these motions the weight of the evidence is not an issue before the court, as such motions, in effect, admit the truth of the plaintiff's evidence and all legitimate inferences therefrom favorable to the plaintiff. *Douglas* v. *First National Stores, Inc.*, 54 R. I. 278, and cases cited.

The record in the instant case discloses facts and circumstances which require that the defendant go forward with his evidence. We refrain from drawing any inferences from the evidence so that a jury may hereafter fully and impartially consider the issues of fact in the case uninfluenced by any expression of opinion on our part.

The plaintiff's exception is sustained and the case is remitted to the superior court for a new trial.

*Hartigan, Mullen & Roberts, Wilfrid E. McKenna,* for plaintiff.

*Charles F. Risk,* for defendant.